## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| RYAN SCHAPER, | ) |
| | ) |
| Plaintiff, | ) Civil Action No. _____ |
| | ) |
| v. | ) |
| | ) |
| LENSAR, INC., NICHOLAS T. | ) **VERIFIED COMPLAINT FOR** |
| CURTIS, THOMAS R. STAAB, II, | ) **VIOLATIONS OF THE FEDERAL** |
| WILLIAM J. LINK, THOMAS B. | ) **SECURITIES LAWS** |
| ELLIS, TODD B. HAMMER, | ) |
| RICHARD L. LINDSTROM, JOHN P. | ) <u>JURY TRIAL DEMANDED</u> |
| MCLAUGHLIN, ELIZABETH G. | ) |
| O'FARRELL, AIMEE S. WEISNER, | ) |
| AND GARY M. WINER | ) |
| | ) |
| Defendants. | ) |
| | ) |

Plaintiff, Ryan Schaper ("Plaintiff"), by and through his attorneys, alleges the following on information and belief, except as to the allegations specifically pertaining to Plaintiff, which are based on personal knowledge.

## NATURE OF THE ACTION

1.      This action stems from a proposed transaction announced on June 8, 2023 (the "Proposed Transaction" or "North Run Approval"), pursuant to which North Run Capital, LP ("North Run") will be able to elect to have all of its Series A Convertible Preferred Stock converted into an aggregate of 7,940,446 common shares of Lensar, Inc. ("Lensar" or the "Company"), and prior to their conversion, can be voted on an as-converted-to-common-stock basis, without the existing

restriction on North Run's beneficial ownership to 19.99% of the Company's common stock (the "Beneficial Ownership Block"). Additionally, North Run will have the ability to acquire up to 4,367,246 shares of common stock by exercising its Warrants (defined below), without restriction by the Beneficial Ownership Block.

2. The effect of the North Run Approval, based on shares outstanding as of June 2, 2023 (assuming that all Warrants are exercised), is that North Run would obtain 57.0% of the voting power of the Company as well as 55.1% of beneficial ownership of the Company and thus become the controlling shareholder of the Company.

3. The success of the Proposed Transaction is conditioned on the approval from the holders of a majority of its outstanding common shares. The Company's directors and executive officers have entered into an agreement to vote their combined voting power of 15.8% in favor of the approval of the North Run Proposal. Prior to entering into the Purchase Agreement, North Run beneficially owned 1,100,592 shares, or approximately 9.9% of Lensar common stock and has stated that it would not exercise any of its voting power in support of the Proposed Transaction. The vote on the North Run Proposal is scheduled for August 1, 2023.

4. On June 20, 2023, Defendants filed a definitive proxy statement on a Schedule 14A (the "Proxy") with the United States Securities and Exchange Commission ("SEC") in connection with the Proposed Transaction. As described

herein, the Proxy omits material information with respect to the Proposed Transaction, which renders it false and misleading, in violation of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), and SEC Rule 14a-9, 17 C.F.R. 140.14a-9 ("Rule 14a-9") promulgated thereunder.

5.      Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' wrongdoing described herein.

6.      Plaintiff also seeks an injunction requiring the Proxy to be supplemented with the omitted material information, so the Company's stockholders can make an informed decision whether to vote in favor of the Proposed Transaction.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over all claims asserted herein pursuant to Section 27 of the Exchange Act, 15 U.S.C § 78aa, and 28 U.S.C. § 1331, as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act.

8.      This Court has personal jurisdiction over all of the Defendants because each is either a corporation that conducts business within this District, or is a person or entity that is either present in this District for jurisdictional purposes or has

sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

9.     Venue is proper under 28 U.S.C. § 1391 because a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## PARTIES

10.     Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of Lensar Common Stock.  Plaintiff beneficially owns 431,206 shares, or approximately 3.9%, of Lensar Common Stock.

11.     Defendant Lensar is a Delaware corporation, with its principal executive offices located in Orlando, Florida.  Lensar's Common Stock is listed on the NASDAQ under the symbol "LNSR."

12.     Defendant Nicholas T. Curtis ("Curtis") has been Lensar's Chief Executive Officer from February 2012 to the present and acted as the Chief Commercial Officer from August 2010 to February 2012.  Since February 2012, Curtis has served as a member of the Company's Board of Directors.  Curtis, Lensar's CEO, had actual knowledge and supervision over Lensar's statements filed in the Proxy with the SEC, and was the Proxy's signatory.

13.     Defendant Thomas R. Staab, II ("Staab") has been Lensar's Chief Financial Officer since May 2020.

14.     Defendant William J. Link ("Link") has served as Chairperson of Lensar's Board of Directors since November 2017.

15.     Defendant Thomas B. Ellis ("Ellis") has served as a member of Lensar's Board of Directors since May 2023.  Ellis is a co-founder and a co-managing partner of North Run.

16.     Defendant Todd B. Hammer ("Hammer") has served as a member of Lensar's Board of Directors since May 2023.  Hammer is a co-founder and a co-managing partner of North Run.

17.     Defendant Richard L. Lindstrom ("Lindstrom") has served as a member of Lensar's Board of Directors since February 2018.

18.     Defendant John P. McLaughlin ("McLaughlin") has served as a member of Lensar's Board of Directors since May 2017.

19.     Defendant Elizabeth G. O'Farrell ("O'Farrell") has served as a member of Lensar's Board of Directors since February 2021.

20.     Defendant Aimee S. Weisner ("Weisner") has served as a member of Lensar's Board of Directors since February 2021.

21.     Defendant Gary M. Winer ("Winer") has served as a member of Lensar's Board of Directors since April 2018.

22.     The defendants listed in ¶¶ 12-21 are collectively referred to herein as the "Individual Defendants."

23.     Lensar and the Individual Defendants are referred to herein as "Defendants."

24.     North Run is a privately owned hedge fund.

## SUBSTANTIVE ALLEGATIONS

*Background*

25.     According to its public statements, Lensar is "a commercial-stage medical device company focused on designing, developing and marketing advanced femtosecond laser systems for the treatment of cataracts and the management of pre-existing or surgically induced corneal astigmatism."  Lensar 2022 Form 10-K ("2022 10-K") at 7, filed with the SEC on March 16, 2023.

26.     Lensar's two laser systems, "the LENSAR Laser System and ALLY® Adaptive Cataract Treatment System, or ALLY System, incorporate a range of proprietary technologies designed to assist the surgeon in obtaining better visual outcomes, efficiency and reproducibility by providing advanced imaging, simplified procedure planning, efficient design and precision."  2022 10-K at 7.  Lensar's laser systems are subject to U.S. Food and Drug Administration ("FDA") oversight and approval.

27.     The newer ALLY System "combines all of the features from [the] LENSAR Laser System with a dual-pulse laser, integrated in a small, compact cataract treatment system that is designed to allow surgeons to perform a

femtosecond laser assisted cataract procedure in a single operating room." 2022 10-K at 7.

28.     The 2022 10-K (at 11) describes the cumbersome process typical to cataract procedures:

> Currently, almost all cataract procedures, whether manual or laser-assisted, involve the use of a phacoemulsification system to fracture and remove the cataract. For most surgeons that also use a laser-assisted system, the laser system is stationed in a separate room from the phacoemulsification system, as the size of most operating rooms will not accommodate placement of all the other necessary equipment, and these two critical pieces of equipment operate independently. This configuration results in significant interruption in the patient flow, by requiring the patient to be moved from one room to the next during the course of the procedure.

29.     According to the 2022 10-K (at 11), the ALLY System solves this problem by allowing the surgeon to access the laser-assisted system as well as the phacoemulsification system:

> We have designed our ALLY System to have a small footprint, allowing it to be placed in any operating room or in-off surgery suite, to allow the surgeon to switch seamlessly and quickly between femtosecond laser and phacoemulsification device without moving patients from room-to-room. Importantly, this system was designed with the ergonomics in-mind to be used in the operating room or the in-office surgical suite. The footprint is significantly smaller than current laser systems and only slightly larger than stand-alone phacoemulsification systems. The additional enhancements to our existing laser technology that are incorporated into our ALLY System include a more versatile laser that uses pulse characteristics designed for tissue specific targeting with significantly faster speeds in different applications. We expect this system could be a considerable advancement and will provide significant surgical workflow and financial benefit to a surgeon's practice and ASC or hospital.

30.     According to Lensar's Form 8-K filed on June 13, 2022, the ALLY System received FDA 510(k) clearance on June 9, 2022.  Shortly thereafter, as early as August 2022, Lensar began commercialization of the ALLY System.

**_Pre-FDA Approval_**

31.     Given ALLY System's substantial upgrade compared to existing laser systems, Lensar projected that the laser system would substantially increase the Company's market share, revenues, and profits.

32.     Since at least 2021, prior to FDA approval of the ALLY System in June 2022, Defendant Curtis and Defendant Staab made recurring statements to Plaintiff and other individual and institutional shareholders that the Company intended to raise $10 million to $20 million of growth working capital to accelerate sales of the ALLY System.  These statements were made via phone calls and emails.

33.     During one or more of these calls, Curtis and/or Staab stated that based on the Company's internal budget, the Company projected the capital raise would allow the Company to reach approximately $200 million in revenue by around 2026 – 2027 and that because private market valuations would be three to five times revenue, valuations of the Company would likely be approximately $500 million. At the time of these representations, the Company had a market capitalization of only $30 million to $80 million.  At the time, there was a limited market for the Company's stock since the Company was not well known, its shares were illiquid,

there were no real public comparable companies, nor were there analysts who followed the Company or knew the space.

34.     Around this time, during one or more of these calls, Curtis and/or Staab made explicit representations to Plaintiff (and Plaintiff understands other shareholders) that the Company would use a $10 million to $20 million line of credit to finance the growth, rather than a dilutive equity raise.  Plaintiff stated to them several times that he was highly against dilution, and was aware of other shareholders expressing the same position.

35.     Management, including Curtis and Staab, made assurances to Plaintiff (and Plaintiff understands other shareholders) that a dilutive equity deal was not necessary.

36.     Management further assured Plaintiff (and Plaintiff understands other shareholders) that in the event that Lensar needed to do a dilutive capital raise, the Company would allow shareholders to participate.

37.     On June 13, 2022, the Company announced that the FDA had approved the ALLY System.  According to the announcement,

> On June 9, 2022, the Company received FDA 510(k) clearance for its ALLY System. ALLY is the first FDA-cleared platform to enable cataract surgeons to complete the femtosecond-laser-assisted cataract surgery procedure seamlessly in a single, sterile environment.
>
> The Company plans to deliver the first ALLY Systems to surgeons in the third quarter of this year through a controlled and targeted initial

launch. Following this launch, the Company plans to make ALLY widely available to cataract surgeons in 2023.

***Post-FDA Approval***

38.     The FDA's approval of the Company's ALLY System logically led to the Company's desire to obtain growth capital, but at a time when capital markets were becoming distressed.  Around this time, Plaintiff and (Plaintiff is told) other shareholders had additional conversations with Curtis and Staab about obtaining the $10 million to $20 million of capital needed to accelerate sales of the system.  In multiple conversations, Curtis and Staab told Plaintiff that only $10 million was needed to launch the product but $20 million would allow for a more aggressive launch.

39.     Around Q4 2022 and Q1 2023, Staab told Plaintiff that the Company intended to raise $10 million using a line of credit and would raise an additional $10 million in equity in a year.  He also stated again on this call that only the $10 million was needed to launch ALLY, the second $10 million was optional.

40.     Around December 2022, Plaintiff learned from conversations with Staab that the Company received approval for a $10 million credit line at approximately 10% interest and 50,000 warrants.  Plaintiff encouraged Staab to accept the deal and opt for a more conservative launch of the ALLY System.

41.     Around December 2022 and January 2023, Staab informed Plaintiff that the Board decided against accepting the $10 million line of credit in order to

pursue a $20 million line of credit.  Staab told Plaintiff that the Board was optimistic about the prospects and reception of the ALLY System and wanted to push for a larger line of credit.  Moreover, the Board believed that if they could not secure a $20 million line of credit, they would be able to secure the existing $10 million line of credit offer.

42.    Around Q1 2023, Plaintiff had multiple conversations with Curtis and Staab to discuss the then state of financing.  Over the course of these conversations, Curtis and Staab continued to make assurances to Plaintiff that the Company had good options and that it would not agree to materially dilutive equity deals. Moreover, Curtis and Staab touted the Company's healthy cash flow, already reaching operating cash-flow break even.  They also stated that they had alternative options for financing growth such as taking the Company private, eliminating approximately $6 million in public company costs.

43.    On a call on January 27, 2023, Staab discussed a potential capital raise or buyout with the Company with Plaintiff and Rich Lee, another individual shareholder owning 2-3% of Lensar common stock.  Staab told Plaintiff and Lee that he would keep them updated.  Plaintiff and Lee expressed a strong clear interest in becoming restricted and working on a capital raise or a buyout of the Company.

44.    On another call in or around March 2023, Curtis told Plaintiff that the trading price of Lensar common stock was so low that they were considering a

management buyout, as the transaction would be profitable. Plaintiff stated that he wanted to participate in a buyout or any equity raise. Curtis assured Plaintiff that he would be able to participate in either. In this conversation Curtis reiterated that $10 million was all that was needed to operate the Company's growth plan and that they had good options available.

45.   Around April 2023, Madison Avenue Partners, LP ("MAP"), a beneficial owner of 669,046 shares or 9.65% of Lensar common stock, spent time with the Company developing a debt financing agreement. The Company had ongoing discussions with MAP before abruptly ceasing all communications.

46.   Plaintiff is aware that other significant shareholders had similar conversations with Management.

***The North Run Deal***

47.   Instead of going to existing shareholders or obtaining the necessary funds with a line of credit or some other debt or equity issuance available to all shareholders, the Company chose to do an unnecessary and highly dilutive equity far below market transaction with only one of its shareholders, North Run, who presumably was given access to the Company's impressive but undisclosed budget numbers. Thus, on May 15, 2023, Lensar disclosed in a Current Report on Form 8-K filed with the SEC that the Company had entered into a Securities Purchase Agreement (the "Purchase Agreement") with NR-GRI Partners, LP (the "Buyer"), a

Delaware limited partnership and an affiliate of North Run, on May 12, 2023. Pursuant to the terms of the Purchase Agreement, the Company agreed to issue and sell to the Buyer, for an aggregate gross purchase price of $20 million, (i) an aggregate of 20,000 shares of Series A Convertible Preferred Stock ("the Preferred Shares"), a newly established series of preferred stock, which have a stated value of $1,000 per share and are initially convertible into 7,940,446 shares (the "Conversion Shares") of Common Stock, and (ii) warrants (the "Warrants") to purchase an aggregate of 4,367,246 shares of Common Stock (the "Warrant Shares").

48.     Pursuant to the Purchase Agreement, on May 18, 2023, the Company filed the Certificate of Designations, Preferences and Rights of Series A Convertible Preferred Stock (the "Certificate of Designations") to its Amended and Restated Certificate of Incorporation with the Secretary of State of the State of Delaware. Under the Certificate of Designations, holders of Preferred Shares are entitled to vote on an as-converted basis with the Common Stock, subject to a limitation providing that Preferred Shares will not be converted to the extent that the conversion would cause the Buyer, together with its affiliates, to become the beneficial owner of more than 19.99% of the Company's Common Stock.

49.     Similarly, pursuant to the Purchase Agreement, on May 18, 2023, the Company issued to Buyer 2,183,623 Class A Common Stock Purchase Warrants and 2,183,623 Class B Common Stock Purchase Warrants, exercisable at any time up to

and including the fifth anniversary of the closing date of the Offering, subject to the Beneficial Ownership Block.

***Shareholder Response to the North Run Deal***

50.    After the closing of the Purchase Agreement, Plaintiff questioned Curtis and Staab about the terms of the deal.  According to Curtis and Staab, the Company entered into the agreement because North Run was "the only investor that offered a term sheet."  During the conversation, Plaintiff learned that North Run initially offered to issue equity to Management and the Board.  However, Management and the Board decided against it stating that "the optics would be bad." Plaintiff learned that other Shareholders had similar calls with Management. Plaintiff stated on the call that if North Run had offered to enrich Management and the Board as part of this deal and that it was ultimately decided against because of "optics" that assurances were likely given that Management and the Board would be compensated later, after North Run obtained control. According to Plaintiff, Curtis stammered awkwardly about how of course they could not do such a thing as a public company.

51.    In another call with Staab, Staab stated that he tried to get Plaintiff and other interested shareholders included in the deal, but that Curtis and Link directed Staab to stop trying to get other shareholders included that it would not be allowed. According to Staab, he, himself, was excluded from some discussions with

Management and the Board about the deal with North Run.

***Removal of the Beneficial Ownership Block***

52.     Pursuant to the Purchase Agreement, the Beneficial Ownership Block limits North Run's ability to convert its Preferred Shares to Conversion Shares and to exercise its Warrants to the extent where the conversion and exercise does not result in North Run becoming a beneficial owner of more than 19.99% of Lensar's common stock.

53.     On June 8, 2023, the Company filed a preliminary proxy statement on a Schedule 14A with the SEC announcing the Proposed Transaction.  On June 20, 2023, the Company filed a definitive proxy statement on a Schedule 14A (the "Proxy") with the SEC in connection with the Proposed Transaction.

54.     Pursuant to Nasdaq Listing Rule 5635(b), the Proposed Transaction requires shareholder approval as the issuance of securities would result in a change of control of a company, which occurs when an investor holds 20% or more of a company's then-outstanding capital stock after a transaction and such ownership or voting power would be the company's largest ownership position.

55.     As stated above, the approval of the Proposed Transaction would result in North Run having the ability to convert its Preferred Shares into an aggregate of 7,940,446 shares of Lensar Common Stock and to acquire up to 4,367,246 shares of Common Stock by exercising its Warrants.  Moreover, approval of the Proposed

Transaction would remove the Purchase Agreement's limitation on North Run's ability to vote in excess of 19.99% beneficial ownership, allowing North Run to exercise up to 57.0% voting power of the Company.

56.     These transactions would result in a change of control of the Company as North Run would obtain 57.0% of voting power of the Company as well as 55.1% of beneficial ownership of the Company.  The per share implied value of the shares North Run would receive for its $20 million payment was only approximately $1.625 when the market price of the shares at that time was approximately $3.00 per share, a level that Management believed to be significantly undervalued based on undisclosed (but almost certainly disclosed to North Run) impressive forecasts.

57.     Although the Proxy provides Lensar's shareholders with an overview of the Proposed Transaction, it omits certain critical information that renders portions thereof materially incomplete and/or misleading, in violation of the Exchange Act provisions discussed herein.  As a result, Lensar's shareholders lack material information necessary to allow them to make an informed decision when voting on the North Run Approval.

58.     In particular, the Proxy contains materially incomplete information concerning, among other things, shareholder interest in financing the capital raise on more favorable, less-dilutive terms and the internal budget projecting a significant increase in the Company's market share, revenue, and valuation.  The Proxy also

does not disclose that Management not only did not explore these options but suppressed proposals from other investors by stating that the Company would not do any dilutive equity financings and that other shareholders would be included in the event a financing like that were considered – as would be normal in such circumstances.

59.     As described herein, the Proxy omits material information with respect to the Proposed Transaction, which renders it false and misleading, in violation of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), and SEC Rule 14a-9, 17 C.F.R. 140.14a-9 ("Rule 14a-9") promulgated thereunder.

### Material Omissions Concerning Shareholder Interest in Financing on More Favorable Terms

60.     The Proxy fails to disclose material information with respect to shareholder interest and discussions with Management concerning financing Lensar's capital raise on more favorable, less dilutive terms.  In particular, multiple shareholders, including Plaintiff, aware of Lensar's plans to raise capital, informed Management and the Board that they were interested in participating in any equity raise, and Management gave assurances that shareholders would be included in such an equity raise.  Throughout multiple conversations with Management and the Board, these shareholders were told that the Company had good options for raising equity and would not agree to any materially dilutive equity deals.  A description of

these discussions is material to Lensar shareholders because it enables them to properly determine whether the Proposed Transaction with North Run provides the best option and favorable terms to raise capital. The Proxy failed to disclose that Management essentially suppressed the company's funding options and increased its cost of funding by not engaging existing shareholders and exploring their ability to finance the company's capital needs.

61.     The Proxy also fails to disclose any information pertaining to the Company's ongoing discussions with MAP regarding the development of a debt financing agreement. The Company abruptly ceased all communications with MAP a few weeks prior to the announcement of the Purchase Agreement with North Run. Details about the debt financing agreement and why the Company decided to cease communications with MAP is information that is material to Lensar shareholders because it enables them to properly determine whether all the strategic options for raising capital have been fully considered, and whether the Proposed Transaction is leaving any potential superior offers on the table.

62.     Furthermore, the Proxy fails to disclose material information about the Company's internal budget. Specifically, the Proxy fails to disclose what Management said to Plaintiff and others about the Company's budget and analysis indicating that a capital raise would allow the Company to reach approximately $200 million in revenue by around 2026 – 2027 and given 3x-5x revenue multiple

valuation ranges would result in a valuation of approximately $500 million or more. This information is material to Lensar's shareholders because the Company's financial forecast enables them to assess whether to pursue a capital raise with a line of credit or other debt transaction, or with a dilutive equity deal such as the Proposed Transaction with North Run.

63.    Without this information, Lensar's shareholders cannot evaluate for themselves the terms of the Purchase Agreement and cannot make a meaningful determination of whether removing the Beneficial Ownership Block would be in the best interests of the Company.

64.    The disclosure of the information discussed above would be material to Lensar's shareholders because they need to be fully informed about whether Management and the Board had the shareholders' best interest in mind and were acting in good faith when they were negotiating and then, agreed to the Proposed Transaction.

**CAUSES OF ACTION**

**<u>COUNT I</u>**

**Claim for Violation of Section 14(a) of the Exchange Act
and Rule 14a-9 Promulgated Thereunder
(Against All Defendants)**

65.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

66.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person

. . . , in contravention of such rules and regulations as the [SEC] may prescribe as

necessary or appropriate in the public interest or for the protection of investors,  to

solicit or to permit the use of his name to solicit any proxy or consent or authorization

in respect of any security (other than an exempted security) registered pursuant to

section 78l of this title."  15 U.S.C. § 78n(a)(1).

67.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the

Exchange Act, provides that solicitation communications with shareholders shall not

contain "any statement which, at the time and in the light of the circumstances under

which it is made, is false or misleading with respect to any material fact, or which

omits to state any material fact necessary in order to make the statements therein not

false or misleading."  17 C.F.R. § 240.14a-9(a).

68.     Rule 14a-9 further provides that, "[t]he fact that a proxy statement, form

of proxy or other soliciting material has been filed with or examined by the

[Securities and Exchange] Commission shall not be deemed a finding by the

Commission that such material is accurate or complete or not false or misleading, or

that the Commission has passed upon the merits of or approved any statement

contained therein or any matter to be acted upon by security holders.   No

representation contrary to the foregoing shall be made."  17 C.F.R. § 240.14a-9(b).

69.     As discussed herein, the Proxy omitted material facts concerning, among other thing, shareholder interest in financing Lensar's capital raise on more favorable, less-dilutive terms and the internal budget projecting a significant increase in the Company's market share, revenue, and valuation.  Defendants prepared, reviewed, filed, and disseminated the false and misleading Proxy to Lensar's shareholders.  In doing so, Defendants knew or recklessly disregarded that the Proxy failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

70.     The omissions and incomplete and misleading statements in the Proxy are material in that a reasonable shareholder would consider them important in deciding how to vote their shares.  In addition, a reasonable investor would view such information as altering the "total mix" of information made available to shareholders.

71.     By virtue of their positions within the Company and/or roles in the process and in the preparation of the Proxy, Defendants were undoubtedly aware of this information and had previously reviewed it, including participating in the Purchase Agreement negotiation and process.

72.     The Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction.

73.   Defendants knew that Plaintiff and the other shareholders would rely upon the Proxy in determining whether to vote in favor of the Merger.

74.   As a direct and proximate result of Defendants' unlawful course of conduct in violation of Section 14(a) of the Exchange Act and Rule 14d-9, absent injunctive relief from the Court, Plaintiff and the other shareholders will suffer irreparable injury by being denied the opportunity to make an informed decision as to whether to vote in favor of the Merger.

75.   Plaintiff has no adequate remedy at law.

## COUNT II

### Claim for Violations of Section 20(a) of the Exchange Act
### (Against the Individual Defendants)

76.   Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

77.   The Individual Defendants acted as controlling persons of Lensar within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers or directors of Lensar, and participation in or awareness of the Company's operations or intimate knowledge of the false statements contained in the Proxy filed with the SEC, they had the power to influence and control, and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

78.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

79.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised the same.  The Proxy contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were thus directly connected with and involved in the making of the Proxy.

80.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) of the Exchange Act and Rule 14d-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons and the acts described herein, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

81.     As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

82.     Plaintiff has no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Preliminarily and permanently enjoining Defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

B.     Directing the Individual Defendants to disseminate a Proxy that states all material facts required in it or necessary to make the statements contained therein not misleading;

C.     In the event Defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages to Plaintiff;

D.     Directing Defendants to account to Plaintiff for their damages sustained because of the wrongs complained of herein;

E.     Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

F.     Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: June 26, 2023

COOCH & TAYLOR, P.A.

*/s/ Carmella P. Keener*
Carmella P. Keener (#2810)
The Brandywine Building
1000 N. West Street, Suite 1500
OF COUNSEL (*pro hac vice motions*     Wilmington, DE 19899
*forthcoming*):                        (302) 984-3816
                                       ckeener@coochtaylor.com

Carl L. Stine
Justyn J. Millamena                        *Counsel for Plaintiff*
WOLF POPPER LLP
845 Third Avenue
New York, NY 10022
(212) 759-4600